Mihal Emberton
201 Ashton Avenue
San Francisco, CA 94112
530-219-0665
Mihal.emberton@gmail.com



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA



| MIHAL EMBERTON, | Case No.: 22-cv-05440-TSH |
|---|---|
| Plaintiff, | |
| vs. | MOTION TO RECUSE CITY ATTORNEY AND CITY ATTORNEY'S OFFICE |
| SAN FRANCISCO CITY GOVERNMENT (CITY AND COUNTY OF SAN FRANCISCO), | |
| Defendant | |

## STATEMENT OF FACTS

It is a fact that the San Francisco City Attorney's Office manages the San Francisco Code Enforcement Process, as evidenced by the City Attorney's Webpage titled, "Code Enforcement," https://www.sfcityattorney.org/aboutus/teams/code/.   Specifically, the website details:

"ABOUT
Aggressive legal action on behalf of the City to ensure safety and maintain property on behalf of its residents is what defines this team's work. The Code Enforcement and Resident Protection Team uses civil enforcement methods to improve conditions in areas where San Francisco's Fire, Building, Housing and Planning Codes, or California Health and Safety Code and Disability Access Regulations have been violated.

Each member of the Code Team is assigned to a different San Francisco district where they work with other City departments to identify code violations and pursue legal action against those who do not take steps to abate the identified problem. Working with the Department of Building Inspection, the Fire Department, the Department of Human Services, the Planning Department, the Police Department and the Health Department the Code Enforcement focuses on keeping San Francisco safe.

WHAT IS CODE ENFORCEMENT?

MOTION TO RECUSE CITY ATTORNEY AND CITY ATTORNEY'S OFFICE - PAGE **1** OF **16**

The Office of the City Attorney coordinates the efforts of the Building, Health, Planning, Public Works, Fire, and Police Departments to identify and respond effectively to health and safety threats and other public nuisance issues in San Francisco's neighborhoods. When a code violation is reported, the Code Enforcement Team at the City Attorney's Office responds by coordinating the investigation and abatement process by the relevant city agencies and, when necessary, pursuing additional remedies against violators through court action.

WHY ENFORCE CITY CODES?
City codes exist as both preventive and regulatory ways to protect the character and integrity of San Francisco's neighborhoods, as well as the health and safety of its citizens. The Office of the City Attorney engages in proactive community outreach to educate residents and business owners about their rights and responsibilities. This function of city government exists to protect citizens, and the Office of the City Attorney's code enforcement efforts are an integral part of making San Francisco a safe and healthy place to live, work, and play!

TYPES OF CODE ENFORCEMENT VIOLATIONS
Substandard Housing and Building Code Violations
Lack of heat or water, dilapidated conditions, musical rooming, unsafe or illegal construction, plumbing, electrical and/or mechanical problems, seismically unsafe buildings

Fire Hazards
Lack of fire sprinklers or sprinklers that don't work, lack of fire extinguishers, blocked or locked exits, overcrowding of public spaces

Criminal Activity
Drug dealing, prostitution, illegal businesses, gang violence, nuisances at liquor stores and entertainment venues, gambling, excessive noise

Health Code Violations
Insect or rodent infestation, trash accumulation, abandoned cars/trucks

Land Use Issues
Unauthorized property uses, unpermitted in-law units, commercial auto repair at residential properties, illegal signs, non-compliance with landmark preservation laws, destruction of San Francisco historical landmarks

Public Works Violations
Illegal dumping, blight, broken sidewalks in front of residences or businesses

Copyright © 2023 City Attorney of San Francisco"[1]

It is a fact that the Code Enforcement program extends beyond the City Attorney's "Code Enforcement Team" to include Code Enforcement agents and Code Enforcement processes within DBI, Planning, and DPW; this case also clearly shows that all three agencies became involved in our Notice of Violation code enforcement case.

It is a fact that when the City's Code Enforcement Process causes injury or harm from a violation of civil rights or other violations of the law, the claim describing the injury or harm is filed with the City Attorney's Office, as evidenced by the City Attorney's Webpage titled, "Filing a Claim."[2]   It is also a fact that the two claims of injustice from the Code Enforcement process that this Plaintiff filed on February 8, 2022, and June 21, 2022 were filed with the City Attorney's Office.

It is a fact that by managing the San Francisco Code Enforcement Process, a conflict of interest is created such that when claims are filed with the City Attorney's Office about civil rights violations or other violations of the law from the Code Enforcement Process, the City Attorney's Office is confronted with choosing either the self-interest to defend their innocence regarding their management of the Code Enforcement Program versus the societal/government/City interest to protect and defend the civil and human rights of citizens from the Code Enforcement Program that they themselves manage.

It is a fact that SF Citizens are a 'nonclient third party' of the City Attorney as it is a fact that SF Citizens are the beneficiaries of the City.

---

[1] https://www.sfcityattorney.org/aboutus/teams/code/ Accessed 5-1-2023.

[2] https://www.sfcityattorney.org/claims/ Accessed 5-1-2023.

It is a fact that the City Attorney's Office has not shown any valid attempts to collaborate with this Plaintiff to consider, understand, nor address claims of civil rights violations and other violations of the law from their Code Enforcement Program despite many opportunities such as (1) this Plaintiff's personal outreach to the City Attorney on December 11, 2021[3], (2) two claims of civil rights violations and other violations of the law filed with the City Attorney's Office on February 8, 2022,[4] and June 21, 2022, and (3) participation in the Meet and Confer for this case. Furthermore, despite two claims being filed with the City Attorney's office regarding numerous claims of civil rights violations and other violations of the law by the Code Enforcement process, NO "request for information by the Claims Division of the City Attorney's Office" was sought to better understand or even discuss the claims. Together this evidence proves that the

---

[3] from:   mihal emberton <mihal.emberton@gmail.com>
to:      cityattorney@sfcityatty.org
date:    Dec 11, 2021, 9:50 AM
subject: Meeting to discuss city policy and social justice

"Dear Mr. Chiu

I am writing to humbly request a meeting with you to collaborate around removing unconscious bias and discrimination from a large portion of our city policies and procedures. While I am not an attorney, I do have a strong background in public policy and social justice and hold multiple copyrights and peer-reviewed publications on the science of social justice and democracy. While I believe that we will both be attending the San Francisco Marin Medical Society Board of Directors meeting on Monday, January 10th, I am hoping that we can schedule time outside of this event to collaborate around our shared goals of positive social justice change.

Thank you so much for your time and consideration,

Mihal Emberton, MD, MPH, MS
Online CV: https://orcid.org/0000-0002-7858-9041"

[4] "Unfortunately, since 2017, it has become evident that perpetual inconsistencies within our City General Plan sanction civil rights violations throughout the complaint, permitting and enforcement processes... These never-ending civil rights violations are also proven forms of abuse ravaging our physical and mental wellbeing and ought to be barred imminently and permanently. We thus also hope that your office will review our policy suggestions and work with our city agencies, the Human Rights Commission, and the Board of Supervisors to institute much needed and long overdue social justice reforms to further protect the civil rights of San Franciscans and build better collaboration between our citizens and our fundamental city agencies. We are grateful for your assistance and advocacy and look forward to working with you..."

societal/government/City interest to protect and defend the civil rights of citizens from the City

Attorney's Code Enforcement Program does not appear to be a consideration nor a possibility for

San Francisco citizens.

## ARGUMENT

In 2008 The Justice Department and the Federal Trade Commission ("FTC") provided

comments to the Supreme Court of Hawai'i and the Hawai'i State Bar Association ("HSBA")

regarding a new rule to <u>define the practice of law</u>:[5]

> "The definition set forth in section (b)(2) is designed to focus first on the two essential elements of the practice of law: The provision of legal advice or services, and a client relationship of trust or reliance. . . . The presumption that one's engagement in one of the enumerated activities is the "practice of law" may be rebutted by showing that there is no client relationship of trust or reliance, or that there is no explicit or implicit representation of authority or competence to practice law, or that both are absent. . . . [T]he Rule is not intended to cover conduct which lacks the essential features of an attorney-client relationship. . . . Tax accountants, real estate agents, title company attorneys, securities advisors, pension consultants, and the like, who do not indicate they are providing legal advice or services based on competence and standing in the law are not engaged in the practice of law, because their relationship with the customer is not based on a reasonable expectation that learned and authorized professional legal advice is being given. Nor is it the practice of law under the Rule for a person to draft an agreement or resolve a controversy in a business context, where there is no reasonable expectation that she is acting as a qualified or authorized attorney."

Based on this definition, the City Attorney's Office's management of the Code Enforcement

Program falls outside of their attorney-client relationship to the City and would be considered an

*Executive* function rather than a *Judicial* Function, the fact of which is fundamental not only to

the analysis of conflicts of interest and their affects on neutrality, but also to the analysis of

standing.

------------------------

[5]United Stated Department of Justice. COMMENTS ON PROPOSED DEFINITION OF THE PRACTICE OF LAW. January 25, 2008. https://www.justice.gov/atr/comments-proposed-definition-practice-law. Accessed 5-2-2023.

1

2      The Court in *Ward v. Monroeville*, 409 US 57 - Supreme Court 1972, discussed the valid

3   conflict of interest that exists when Executive Function is combined with Judicial Function and

4   ruled that such conflicts of interest prevent judicial officers from remaining disinterested and

5   impartial "as guaranteed by the Due Process Clause of the Fourteenth Amendment:"

6        "The issue turns, as the Ohio court acknowledged, on whether the Mayor can be
         regarded as an impartial judge under the principles laid down by this Court
7        in *Tumey* v. *Ohio*, 273 U. S. 510 (1927). There, convictions for prohibition law
         violations rendered by the Mayor of North College Hill, Ohio, were reversed
8        when it appeared that, in addition to his regular salary, the Mayor
9        received 60*60 $696.35 from the fees and costs levied by him against alleged
         violators. This Court held that "it certainly violates the Fourteenth Amendment,
10       and deprives a defendant in a criminal case of due process of law, to subject his
         liberty or property to the judgment of a court the judge of which has a direct,
11       personal, substantial, pecuniary interest in reaching a conclusion against him in
12       his case." *Id.,* at 523.

13       The fact that the mayor there shared directly in the fees and costs did not define
         the limits of the principle. Although "the mere union of the executive power and
14       the judicial power in him can not be said to violate due process of law," *id.,* at
15       534, the test is whether the mayor's situation is one "which would offer a possible
         temptation to the average man as a judge to forget the burden of proof required to
16       convict the defendant, or which might lead him not to hold the balance nice, clear
         and true between the State and the accused . . . ." *Id.,* at 532. Plainly that "possible
17       temptation" may also exist when the mayor's executive responsibilities for village
18       finances may make him partisan to maintain the high level of contribution from
         the mayor's court. This, too, is a "situation in which an official perforce occupies
19       two practically and seriously inconsistent positions, one partisan and the other
         judicial, [and] necessarily involves a lack of due process of law in the trial of
20       defendants charged with crimes before him." *Id.,* at 534."

21

22   Therefore, the test for this case is whether the City Attorney's situation of managing the Code

23   Enforcement Process offers any temptation or self-interest which impairs their accurate and

24   effective evaluation of their own management of the Code Enforcement Process.  The City

25   Attorney's Office has refused to engage in any meaningful dialogue or even any dialogue with

26   this Plaintiff regarding concerns of unjust and unconstitutional activity perpetrated by their

27   management of the Code Enforcement process and the City Attorney has repeatedly denied any

28

liability from their management of the Code Enforcement process, proving that a valid conflict of interest exists which impairs the City Attorney from accurately and effectively evaluating their Executive Function management of the Code Enforcement process.

Furthermore, the Court in *People ex rel. Clancy v. Superior Court*, 705 P. 2d 347 - Cal: Supreme Court 1985, discussed the fundamental necessity of neutrality to not only uphold the furtherance of justice to thus uphold the public confidence and trust in the judicial system, but also to ensure that the extraordinary power to deprive citizens of their Fundamental Rights of Life, Liberty, and Property, because of the "connection between the civil and criminal aspects of public nuisance law," is not dispensed unjustly:

> "At the outset we emphasize that the courts have authority to disqualify counsel when necessary in the furtherance of justice. (Code Civ. Proc., § 128, subd. (a)(5); *William H. Raley Co. v. Superior Court* (1983) 149 Cal. App.3d 1042, 1048 [197 Cal. Rptr. 232]; see also *People v. Superior Court (Greer)* (1977) 19 Cal.3d 255, 261, fn. 4 [137 Cal. Rptr. 476, 561 P.2d 1164]; *People v. Municipal Court (Byars)* (1978) 77 Cal. App.3d 294, 298-299 [143 Cal. Rptr. 491].)…
>
> 746*746 In *People v. Superior Court (Greer), supra,* 19 Cal.3d 255, we reviewed the responsibilities associated with the prosecution of a criminal case: (4) "The prosecutor is a public official vested with considerable discretionary power to decide what crimes are to be charged and how they are to be prosecuted. [Citations.] In all his activities, his duties are conditioned by the fact that he `is the representative not of any [sic] ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" (*Id.* at p. 266, quoting *Berger v. United States* (1935) 295 U.S. 78, 88 [79 L.Ed. 1314, 1321, 55 S.Ct. 629].) The American Bar Association's Code of Professional Responsibility elaborates on the public prosecutor's duty to seek justice: "This special duty exists because: (1) the prosecutor represents the sovereign and therefore should use restraint in the discretionary exercise of governmental powers, such as in the selection of cases to prosecute; (2) during trial the prosecutor is not only an advocate but he also may make decisions normally made by an individual client, and those affecting the public interest should be fair to all...." (ABA Code of Prof. Responsibility, EC 7-13.)
>
> Thus a prosecutor's duty of neutrality is born of two fundamental aspects of his employment. First, he is a representative of the sovereign; he must act with the

impartiality required of those who govern. Second, he has the vast power of the government available to him; he must refrain from abusing that power by failing to act evenhandedly. (5) These duties are not limited to criminal prosecutors: "A government lawyer in a civil action or administrative proceeding has the responsibility to seek justice and to develop a full and fair record, and he should not use his position or the economic power of the government to harass parties or to bring about unjust settlements or results." (*Id.,* EC 7-14.)

Not only is a government lawyer's neutrality essential to a fair outcome for the litigants in the case in which he is involved, it is essential to the proper function of the judicial process as a whole. Our system relies for its validity on the confidence of society; without a belief by the people that the system is just and impartial, the concept of the rule of law cannot survive. (See *id.,* EC 9-1, 9-2.)

(6) When a government attorney has a personal interest in the litigation, the neutrality so essential to the system is violated. For this reason prosecutors and other government attorneys can be disqualified for having an interest in the case extraneous to their official function. For example, in *People* v. *Superior Court (Greer), supra,* 19 Cal.3d 255, we disqualified the prosecutor because a woman working in his office was the victim's 747*747 mother, was a material witness, and stood to gain custody of the victim's children if the defendant was convicted. In *Tumey* v. *Ohio* (1927) 273 U.S. 510 [71 L.Ed. 749, 47 S.Ct. 437, 50 A.L.R. 1243], the United States Supreme Court outlawed a system whereby the mayor of a town served as judge in liquor possession cases in which the punishment was a fine. The money paid pursuant to the fine went into a fund from which the mayor could recover his costs for hearing the case. And in *Ward* v. *Village of Monroeville* (1972) 409 U.S. 57 [34 L.Ed.2d 267, 93 S.Ct. 80], an Ohio statute authorizing mayors to sit in ordinance violation cases, the fines from which would go into the municipality's coffers, was held unconstitutional. "[T]he test is whether the mayor's situation is one 'which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused....'" (*Id.* at p. 60 [34 L.Ed.2d at p. 271], quoting, *Tumey, supra,* 273 U.S. at p. 532 [71 L.Ed. at p. 758]; see also *People* v. *Conner* (1983) 34 Cal.3d 141 [193 Cal. Rptr. 148, 666 P.2d 5] [conflict of interest where deputy district attorney was a witness to and arguably a victim of the criminal conduct being prosecuted by others in his office].)

(7) A city attorney is a public official. (*People* ex rel *Chapman* v. *Rapsey* (1940) 16 Cal.2d 636, 639 [107 P.2d 388].) The American Bar Association's Code of Professional Responsibility addresses the special considerations applicable to a lawyer who is also a public official: "A lawyer who is a public officer, whether full or part-time, should not engage in activities in which his personal or professional interests are or foreseeably may be in conflict with his official duties." (ABA Code of Prof. Responsibility, EC 8-8.) "[A]n attorney holding

public office should avoid all conduct which might lead the layman to conclude that the attorney is utilizing his public position to further his professional success or personal interests." (ABA Committee on Prof. Ethics, opn. No. 192 (1939); see also *People v. Conner, supra,* 34 Cal.3d 141, 146.)...

Public nuisance abatement actions share the public interest aspect of eminent domain and criminal cases, and often coincide with criminal prosecutions. These actions are brought in the name of the People by the district attorney or city attorney. (Code Civ. Proc., § 731.)[3] A person who maintains or commits a public nuisance is guilty of a misdemeanor. (Pen. Code, § 372.) (8) "A public or common nuisance ... is a species of catch-all criminal offense, consisting of an interference with the rights of the community at large.... As in the case of other crimes, the normal remedy is in the hands of the state." (Prosser & Keeton, The Law of Torts (5th ed. 1984) p. 618; see also *Board of Supervisors v. Simpson* (1951) 36 Cal.2d 671, 672-675 [227 P.2d 14].) (2c) A suit to abate a public nuisance can trigger a criminal prosecution of the owner of the property. This connection between the civil and criminal aspects of public nuisance law further supports the need for a neutral prosecuting attorney.[4]"

However, the facts of this case prove that the neutrality essential to the Judicial Function of the City Attorney to be able to accurately scrutinize the Code Enforcement process for violations of Fundamental Rights is compromised by the City Attorney's Executive Function management of the Code Enforcement process itself.

Moreover, the conflict of interest created by the Executive Function management of the Code Enforcement process also prevents the neutrality essential to the attorney-client relationship between the City Attorney and the City of San Francisco such that the City Attorney is unable to properly advise the City to create and maintain Code Enforcement policies and practices that protect and ensure the Fundamental Rights of Citizens.    The State Bar of California Rule 1.13 Organization as Client states that

"[i]f a lawyer representing an organization knows* that a constituent is acting, intends to act or refuses to act in a matter related to the representation in a manner that the lawyer knows* or reasonably should know* is (i) a violation of a legal obligation to the organization or a violation of law reasonably* imputable to the organization, and (ii) likely to result in substantial* injury to the organization, the lawyer shall proceed as is reasonably* necessary in the best lawful interest of the organization.

> In dealing with an organization's constituents, a lawyer representing the
> organization shall explain the identity of the lawyer's client whenever the lawyer
> knows* or reasonably should know* that the organization's interests are adverse
> to those of the constituent(s) with whom the lawyer is dealing."

It can and should be universally agreed that "the best lawful interest" of the City and County of

San Francisco is to ensure that the SF Code Enforcement process functions in a Constitutional

manner and does not arbitrarily or unreasonably deprive SF citizens of their Fundamental Rights.

By taking on the Executive Function of managing the Code Enforcement Process, the City

Attorney has not only impaired their own ability to appropriately evaluate, without bias, the

Constitutionality of the Code Enforcement Program, but it has also created a situation in which

the City Attorney manages an Unconstitutional Code Enforcement Program in violation of their

Judicial duty to the City to ensure that all City programs 'follow the law.'

   A fascinating component of this case is the fact that as a citizen of San Francisco, this

Plaintiff is also a 'nonclient third party' of the City Attorney and the City Attorney owes a duty

to this nonclient third party, as it does to the City, to ensure that all City programs 'follow the

law.'[6]  The Court in *Gordon v. ERVIN COHEN & JESSUP LLP*, Cal: Court of Appeal, 2nd

Appellate Dist., 2nd Div. 2023, discussed this duty to nonclient third parties:

> "A lawyer has a duty to a nonclient third party only if the client's intent to benefit
> that third party (in the way the third party asserts in their malpractice claim) is
> "clear," "certain" and "undisputed." (Heyer, supra, 70 Cal.2d at p. 229 ["certain"];
> Paul, supra, 235 Cal.App.4th at pp. 1097, 1098 ["clear"; "undisputed"]; Radovich,
> supra, 35 Cal.App.4th at pp. 958-959 ["certain"]; Moore, supra, 109 Cal.App.4th
> at p. 1299 ["certain"].)"

---

[6] The State Bar of California Rule 1.13 Organization as Client.

It is "clear," "certain" and "undisputed" that the City, as Client of the City Attorney, generally agrees to 'follow the law' to ensure that its beneficiaries,[7] the nonclient third parties (SF citizens), receive effective protection of their Fundamental Rights as outlined by the US Constitution, CA State Constitution, and the associated laws of governance.  In return for ensuring Fundamental Rights, the City's beneficiaries, the nonclient third parties (SF citizens), agree to pay taxes to the City to fund such governance and follow the laws of the land that define just behavior in society.  However, by taking on the Executive Function of managing the Code Enforcement Process, the City Attorney has not only impaired their own ability to appropriately evaluate, without bias, the Constitutionality of the Code Enforcement Program, but it has also created a situation in which the City Attorney manages an Unconstitutional Code Enforcement Program in violation of their Judicial duty to the nonclient third parties, the beneficiaries of the City, the SF Citizens, which is to ensure that all City programs 'follow the law.'[8]

-----

[7] *All* components of the generalized/implied-consent contract between a taxpayer (SF Citizens) and their government (City) outlined by the *Hamilton* Court are intrinsically and legally present: the (1) written contract is the US Constitution, CA State Constitution, and the associated laws of governance that outline (2) the "citizen's performance" to pay taxes to fund governance and follow the laws of the land that define just behavior in society and (3) the "City's breach" if and when the Constitutions and associated laws for just governance are not followed. And the Preamble of the US Constitution characterizes (4) the resulting "damages to the citizen" from the "City's breach of contract" as 'degrading the union, destroying Justice, endangering domestic Tranquility, leaving the people defenseless, harming the general Welfare, and jeopardizing the Blessings of Liberty to ourselves and our Posterity' (*We the people...*), clearly establishing the Citizen as beneficiary.

Secondly, receiving and spending the monies received from taxpayers confirms the City government's (1) knowledge of the existence of the generalized/implied-consent contract between taxpayer and government and (2) recognition of the legitimacy of the generalized/implied-consent contract between taxpayer and government, further reinforcing the Citizen as beneficiary.

And finally, the Court in *Flast v. Cohen*, 392 US 83 - Supreme Court 1968, upheld the existence and legitimacy of the taxpayer-government contract by asserting that the taxpayer has standing to challenge the governance of both their municipality (initially asserted by the Court in *Massachusetts v. Mellon*, 262 US 447 - Supreme Court 1923) as well as the federal government, further confirming the Citizen as beneficiary.

[8] The State Bar of California Rule 1.13 Organization as Client.

MOTION TO RECUSE CITY ATTORNEY AND CITY ATTORNEY'S OFFICE - PAGE 11 OF 16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The Court in *San Francisco v. Cobra Solutions, Inc.*, 135 P. 3d 20 - Cal: Supreme Court 2006 was asked to decide if the entire San Francisco City Attorney's office should be disqualified due to a conflict of interest held by the leadership of the agency.  In discussing separate department units functioning under a single governmental umbrella, the *Cobra* Court emphasized that when the leader of a department maintains a conflict of interest, all of those subordinate to that leader become susceptible to that same conflict of interest and ruled that "[t]he judgment of the Court of Appeal upholding the disqualification of the Office 783*783 of the City Attorney of San Francisco is affirmed," explaining:

> "*Younger* was a successive representation case in which the Court of Appeal upheld the disqualification of the entire Los Angeles 779*779 County District Attorney's Office in the prosecution of a criminal defendant. (*Younger, supra,* 77 Cal.App.3d at pp. 896-897, 144 Cal.Rptr. 34.) The defendant had been represented by the law firm of Johnnie L. Cochran, Jr., who was later appointed assistant district attorney, making him one of "three top executives" supervising "more than 550" deputy attorneys. (*Id.* at pp. 894-895, 144 Cal.Rptr. 34.) When Cochran assumed his new post, the district attorney's office adopted procedures designed to screen Cochran from making crucial decisions, such as whether to settle a case, or whether to seek the death penalty in a capital case, whenever it involved a defendant formerly represented by the Cochran law firm. (*Id.* at p. 895, fn. 3, 144 Cal.Rptr. 34.)

> Notwithstanding the ethical screen erected between Cochran and the prosecution of defendants formerly represented by his law firm, the Court of Appeal upheld the vicarious disqualification of the entire Los Angeles County District Attorney's Office. It noted that Cochran's "presence" in a job "near the top" of the office's hierarchy "could possibly affect" the office's prosecution of his firm's former clients. (*Younger, supra,* 77 Cal.App.3d at p. 897, 144 Cal.Rptr. 34.) Pointing specifically to Cochran's role in formulating prosecutorial policies, it expressed concern that even seemingly unrelated policy decisions could impact the prosecution of these cases. (*Ibid.*) In addition, Cochran's role in the appraisal and promotion of deputies necessarily required him to evaluate the performance of deputies prosecuting his firm's former clients. The Court of Appeal explained: "A deputy handling one or more of such cases would not in all probability forget Cochran's former professional association" with the defense of those cases. (*Ibid.*) Even absent any impropriety, the Court of Appeal cautioned, public perception of the prosecutor's integrity and impartiality would be at risk unless the entire office was disqualified. (*Ibid.*)…

Section 1424 is inapplicable to this case, which is a civil action. Although the statute, which triggers disqualification of a prosecutor from a criminal proceeding "only if" the conflict is "`so grave as to render it unlikely that [the] defendant will receive fair treatment'" (*People v. Griffin* (2004) 33 Cal.4th 536, 569, 15 Cal.Rptr.3d 743, 93 P.3d 344), has superseded *Younger's* holding (see *People v. Conner* (1983) 34 Cal.3d 141, 147, 193 Cal.Rptr. 148, 666 P.2d 5), the concerns that the Court of Appeal in *Younger* expressed about conflicted heads of public law offices, whose policymaking and supervisory duties are such as to preclude them from being effectively screened, have not lost their relevance.[2]

Individuals who head a government law office occupy a unique position because they are ultimately responsible for making policy decisions that determine how the agency's resources and efforts will be used. Moreover, the attorneys who serve directly under them cannot be entirely insulated from those policy decisions, nor can they be freed from real or perceived concerns as to what their boss wants. The power to review, hire, and fire is a potent one. Thus, a former client may legitimately question whether a government law office, now headed by the client's former counsel, has the unfair advantage of knowing the former client's confidential information when it litigates against the client in a matter substantially related to the attorney's prior representation of that client.

There is another reason to require the disqualification of the conflicted head of a government law office. That reason arises from a compelling societal interest in preserving the integrity of the office of a city attorney. It is beyond dispute that the citizens of a city are entitled to a city attorney's office that unreservedly represents the city's best interests when it undertakes litigation. Public perception that a city attorney and his deputies might be influenced by the city attorney's previous representation of the client, at the expense of the best interests of the city, would insidiously undermine public confidence in the integrity of municipal government and its city attorney's office."

As the City Attorney's Office *manages* the City's Code Enforcement Program, all of the attorneys and staff subordinate to the City Attorney become susceptible to the conflicts of interest maintained by the City Attorney Leadership in their management of the Code Enforcement Program.  Furthermore, since Code Enforcement Officers are located under the umbrella of the Department of Building Inspection, the Planning Department, and the Department of Public Works, the City employees subordinate to the City Attorney's management of the Code Enforcement Program extend well beyond the City Attorney's Code

1   Enforcement Team alone so that even if an 'ethical barrier' was attempted to protect the City

2   Attorney's Code Enforcement Team from the conflict of interest of the City Attorney

3   Leadership, that ethical barrier would also need to be enforced within the Department of

4   Building Inspection, the Planning Department, and the Department of Public Works, and even if

5   such an ethical barrier was in place, in order to negate the Conflict of Interest of the City

6   

7   Attorney Leadership, that ethical barrier would need to be *proven to be effective*. And, because

8   the conflict of interest in managing the Code Enforcement process affects not one citizen but

9   possibly *all* property owners in San Francisco, such a conflict of interest is not only arresting, but

10  it is extraordinary, especially when civil rights are at stake.

11  

12       The Court in *Colyer v. Smith*, 50 F. Supp. 2d 966 - Dist. Court, CD California 1999

13  discussed the criteria of legal standing to request removal of opposing counsel:"

14  

> "The requirements for Article III standing, necessary for any party to seek relief
> from a federal court, are that the party have personally suffered an "injury in fact,"
> which is causally related to the conduct in issue and redressable by a favorable
> decision of the court. *Lujan v. Defenders of Wildlife* 504 U.S. 555, 560-61, 112
> S.Ct. 2130, 2136-37, 119 L.Ed.2d 351 (1992). The burden is on the party seeking
> relief to establish these "irreducible constitutional minimum" elements with
> respect to the particular issues the party wishes to have decided. *Id...*
>
> It seems clear to this Court that a non client litigant must establish a personal
> stake in the motion to disqualify sufficient to satisfy the "irreducible constitutional
> minimum" of Article III. Generally, only the former or current client will have
> such a stake in a conflict of interest dispute. However, as the Delaware Supreme
> Court noted in *In re Appeal of Infotechnology Inc.*, in a case where the ethical
> breach so infects the litigation in which disqualification is sought that it impacts
> the moving party's interest in a just and lawful determination of her claims, she
> may have the constitutional standing needed to bring a motion to disqualify based
> on 972*972 a third-party conflict of interest or other ethical violation. In such a
> case, moreover, the prudential barrier to litigating the rights and claims of third
> parties should not stop a district court from determining the motion, because such
> a limitation would be overcome by the court's inherent obligation to manage the
> conduct of attorneys who appear before it and to ensure the fair administration of
> justice. *See Chambers v. NASCO, Inc.,* 501 U.S. 32, 43-44, 111 S.Ct. 2123, 2132,
> 115 L.Ed.2d 27 (1991). This is undoubtedly what the *Yarn Processing* court had
> in mind when it indicated that a "manifest and glaring" ethical breach which

"confronted the court with a plain duty to act" could be addressed on the motion of a non-client litigant. Where the ethical breach is so severe that it "obstructs the orderly administration of justice," the party who finds his claims obstructed has standing. *Cf. Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 790 (9th Cir.1999) ("Ordinarily, to prove an injury in fact under Article III of the Constitution, the plaintiff need only allege an injury that is `fairly traceable' to the wrongful conduct; the injury need not be financial.") (quoting *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 642 n. 2 (2d Cir.1988))...

The standing requirement protects against the strategic exploitation of the rules of ethics long disfavored by the Courts. *See Optyl Eyewear Fashion International v. Style Companies*, 760 F.2d 1045, 1050 (9th Cir.1985) ("The cost and inconvenience to clients and the judicial system from misuse of the rules for tactical purposes is significant. Because of this potential for abuse, disqualification motions should be subjected to `particularly strict judicial scrutiny.'") (citations omitted) (quoting *Rice v. Baron*, 456 F.Supp. 1361, 1370 (S.D.N.Y.1978)); *In re Appeal of Infotechnology, Inc.*, 582 A.2d at 221 ("Infotechnology cannot enforce an alleged technical violation of the Rules especially where it has become apparent that it was seeking to use disqualification as a litigation tactic."); *id.* at 219 ("[I]t is impermissible to allow surrogates to enforce the professional obligations of lawyers for tactical advantage at trial."); *Yarn Processing*, 530 F.2d at 90 (same)."

The question of standing in this case relies on this Plaintiff's 'suffering an "injury in fact," which is causally related to the conduct in issue and redressable by a favorable decision of the court,' which is clearly present.  The City Attorney's conflict of interest (self-interest) in wishing to maintain the current Code Enforcement Program as-is without any consideration for policy reform as well as the City Attorney's overlooking previous requests for collaboration and repeatedly denying any liability from their management of the Code Enforcement Program, creates a barrier throughout these legal proceedings for any possible neutral and effective collaboration with the City Attorney to extinguish arbitrary and unreasonable deprivations of Fundamental Rights from the Code Enforcement program; and the lack of any possible neutral and effective collaboration inherently injures and creates prejudice against this Plaintiff's Code

Enforcement violations' claims (as well as all other property owners' claims of suffering civil rights violations from our Code Enforcement Program).

Based on the facts of this case, the City Attorney's Office maintains a valid and extraordinary conflict of interest such that their self-interest to defend their innocence in how they *Executively* manage their Code Enforcement Program extinguishes their societal/government/City *Judicial* responsibility to (1) neutrally examine potential deficiencies within the Code Enforcement Program for this legal case, to (2) neutrally represent the City as client during this case (and beyond this case), to protect and ensure that the *City* Code Enforcement program protects and enforces the civil rights of all citizens, and to (3) neutrally fulfill their duty to their nonclient third party = SF Citizens = this Plaintiff during this case (and beyond this case), by ensuring that the *City* Code Enforcement program guarantees citizens' Fundamental Rights, and thus recusal of the City Attorney's Office for this case (and possibly all Code Enforcement Cases) fulfills the required elements for disqualification.


Dated this 9 of May 2023.

Mihal Emberton, pro se